J-S21016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: P.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 322 MDA 2023 |

Appeal from the Decree Entered February 8, 2023
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 028-ADOPT-2022

BEFORE: BOWES, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY NICHOLS, J.:      **FILED: AUGUST 15, 2023**

Appellant J.H. (Mother) appeals[1] from the order granting the petition filed by the Cumberland County Children and Youth Services (CCCYS) to involuntarily terminate Mother's parental rights to P.B. (Child). Mother's counsel, Joseph L. Hitchings, Esq. (Attorney Hitchings) has filed a petition to withdraw and an ***Anders***/***Santiago***[2] brief. We grant counsel's motion to withdraw and affirm the trial court's order.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We note that although the order also terminated Father's parental rights, he is not a party to the instant appeal.

[2] ***Anders v. California***, 386 U.S. 738 (1967); ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009); ***see also In re V.E.***, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending ***Anders*** to appeals involving the termination of parental rights).

The trial court summarized the facts underlying this case as follows:

On October 25, 2021, [CCCYS] received a referral that the Newville Police Department received a tip regarding the Mother being in possession of an illegally obtained firearm. As a result, the Newville Police Department located Mother and identified the firearm, as well as methamphetamines, in the same bedroom that Mother was sharing with [Child], her one-month-old daughter. Mother admitted to using methamphetamines for the last three days along with [Child's] father, [L.B. (Father)]. [] Father's immediate whereabouts were unknown and Mother identified Jade Williams and Kaisha Lugo as a safety plan kinship resource for [Child]. On October 26, 2021, the [trial court] provided a verbal order for CCCYS to receive emergency protective custody of [Child] for placement into the emergency caregiver home of Jade Williams and Kaisha Lugo. Mother later tested positive for amphetamines and methamphetamines and admitted to CCCYS that she had been up for three days straight, using methamphetamines with the Father and her mother. They had been actively caring for [Child] while under the influence of methamphetamines. Father had absconded from law enforcement on October 25, 2021, but came to CCCYS on October 26, 2021. When asked to provide a urine sample he claimed he was unable to yield one, however, he admitted to using "Molly" [the crystal form of methylenedioxymethamphetamine (MDMA)] three days prior while also caring for [Child]. While Father was at CCCYS, he was arrested on charges of second-degree felony possession of a firearm prohibited and second-degree felony receiving stolen property.

On October 28, 2021, CCCYS filed a dependency petition alleging that [Child] was without proper parental care, control and supervision placing her health, safety and welfare at risk, as a result of her Mother admitting to using methamphetamines while actively caring for her, Mother testing positive for amphetamines and methamphetamines, Father admitting illegal drug use and his recent arrest.

As a result of the verbal emergency protective custody order received on October 26, 2021, a shelter care hearing was held on October 28, 2021 before Hearing Officer Kate C. Lawrence, and it was ordered that [Child] remain in the legal and physical custody of CCCYS for continued placement with the emergency kinship caregivers (maternal great-aunt and her fiancé). Mother

appeared for the shelter care hearing and did not oppose continued placement for shelter care purposes and Father was unable to appear because of his very recent arrest. The parties waived the 10-day requirement for the adjudicatory hearing to be held and that hearing did not occur until December 6, 2021 before Hearing Officer. Mother had since become incarcerated and did not participate in the hearing, while Father had been released, but was aware of a detainer that had been issued for his arrest out of Dauphin County so he only appeared remotely for the hearing. Following an adjudicatory hearing, it was determined that [Child] was a dependent child based upon clear and convincing evidence. Formal disposition was scheduled separately to allow CCCYS to further explore additional kinship care resources who had been identified while [Child] remained in the legal and physical custody of CCCYS for continued placement with the same emergency caregiver kinship home she was originally placed.

On December 30, 2021, following the dispositional hearing, Hearing Officer Lawrence found [Child], who was only three months old, continued to be dependent while remaining in the legal and physical custody of CCCYS for placement in the same formally approved kinship home she had been residing. At the time of this hearing, Mother was no longer incarcerated, but did not appear for the hearing and had recently failed to report to a treatment-based setting so that she could participate in Overdose Intervention Court [(OIC)]. She had provided a positive drug screen for methamphetamines since her release. Her adult probation officer would have detained her if her whereabouts were known. Father was unable to be located, although mail sent to his last known address had not been returned.

A permanency plan was developed for Mother on November 16, 2021, and subsequently revised on January 7, 2022, June 3, 2022, September 19, 2022, and December 8, 2022. Mother was ordered to cooperate with Cumberland County Probation, maintain consistent visitation with [Child], obtain and maintain stable and appropriate housing, maintain frequent communication with CCCYS and provide any and all updates regarding goals to CCCYS, complete a parenting evaluation through ABC, complete a drug and alcohol evaluation and follow all recommendations from the evaluation, and participate in random drug screening through Restorative Sanctions.

On May 13, 2022, CCCYS petitioned for the involuntary termination of Mother's parental rights (henceforth first

- 3 -

involuntary termination petition).  A hearing on the first involuntary termination petition was scheduled for June 14, 2022. At the time the first involuntary termination petition was filed, Mother had had very minimal contact with CCCYS and other than some virtual visitation on or around December 2021 while she was incarcerated, no contact with [Child].  Mother's whereabouts had been unknown following her release from Cumberland County Prison on December 21, 2021 until she was picked up and reincarcerated there on April 5, 2022.  She had not completed any of her permanency plan goals and had not obtained a drug and alcohol evaluation, submitted to random drug screens or completed a parenting evaluation with ABC.  On the date of the scheduled termination of parental rights hearing, it was determined that Mother was at Pyramid, an inpatient drug and alcohol facility.  Based on this update, CCCYS requested that the first involuntary termination petition be withdrawn without prejudice.  There were no objections to this request by any party or the [guardian *ad litem* (GAL)] and the petition was dismissed without prejudice by order dated June 14, 2022.

On December 5, 2022, CCCYS again petitioned for the involuntary termination of Mother's parental rights (henceforth second involuntary termination petition).  A hearing on the second involuntary termination petition was scheduled for January 24, 2023.  As a result of being unable to complete the hearing on January 24, 2023, the hearing was reconvened on February 8, 2023 for the purposes of having the remaining witnesses testify and presentation of remaining evidence.[3]

Trial Ct. Op., 3/7/23, at 1-5 (unpaginated).

Ultimately, the trial court granted CCCYS's petition terminate Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a) (2), (5), (8), and (b) and to change Child's permanency goal to adoption.  Mother filed a timely notice

---

[3] We note that the prior to the termination hearings, the trial court appointed separate counsel to represent Child's best interests and legal interests. ***See*** Trial Ct. Order, 4/20/22.  At the termination hearings, Tami B. Blackburn, Esq., served as Child's GAL and Cindy Martin, Esq., appeared as Child's legal counsel.

of appeal and complied with Pa.R.A.P. 1925(a)(2)(i). The trial court issued a Rule 1925(a) opinion explaining its reasons for terminating Mother's parental rights.

On appeal, Attorney Hitchings has filed a petition to withdraw and an *Anders*/*Santiago* brief that identifies the following issues:

1. Whether the trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of [Mother's] parental rights to her child under Section 2511(a) of the Adoption Act, 23 Pa.C.S. § 2511(a).

2. Whether the trial court abused its discretion and committed an error of law in terminating [Mother's] parental rights when the conditions which led to the removal or placement of the children no longer existed or were substantially eliminated, thus contravening sections 2511(a) and (b) of the Adoption Act, 23 Pa.C.S. § 2511(a), (b).

3. Whether the trial court abused its discretion and committed an error of law in determining it would be in [C]hild's best interest to have parental rights terminated, when [Mother], if given sufficient time, would be ready, willing and able to parent [C]hild and provide for her needs, thus contravening Section 2511(b) of the Adoption Act, 23 Pa.C.S. § 2511(b).

*Anders*/*Santiago* Brief at 3-4 (some formatting altered).

When faced with an *Anders*/*Santiago* brief, this Court may not review the merits of any possible underlying issues without first examining counsel's request to withdraw. *See In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014). As this Court has stated:

To withdraw pursuant to *Anders*, counsel must:

1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel

- 5 -

> has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.
>
> With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights."

*In re J.D.H.*, 171 A.3d 903, 907 (Pa. Super. 2017) (citations omitted).

Additionally, counsel must file a brief that meets the following requirements established by the Pennsylvania Supreme Court in *Santiago*:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*In re Adoption of M.C.F.*, 230 A.3d 1217, 1219 (Pa. Super. 2020) (citation omitted).

"After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted). Our independent review is not limited

to the issues discussed by counsel, but extends to "additional, non-frivolous issues" that may have been overlooked by counsel. ***J.D.H.***, 171 A.3d at 908 (citation omitted). An appeal is frivolous when it lacks any basis in law or fact. ***See M.C.F.***, 230 A.3d at 1220; ***accord Santiago***, 978 A.2d at 356.

Instantly, Attorney Hitchings has filed a petition to withdraw that states that he conscientiously reviewed the record and determined that the appeal is frivolous. He has also provided this Court with a certificate of service demonstrating that he served Mother with a copy of the motion to withdraw and a letter advising Mother of her right to proceed *pro se* or raise any additional points that Mother deemed worthy of consideration. Additionally, Attorney Hitchings' ***Anders***/***Santiago*** brief provides a summary of the essential facts and procedural history of the case. Counsel also sets forth his reasons for concluding that Mother's appeal is frivolous. For these reasons, we conclude that Mother's counsel has substantially complied with the technical requirements set forth above, and we proceed to an independent review of counsel's assessment that the appeals are frivolous because there was sufficient evidence to terminate Mother's parental rights.[4] ***See S.M.B.***, 856 A.2d at 1237-38.

### Termination of Parental Rights

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported

---

[4] Mother has not filed a brief in response to her counsel's petition to withdraw and ***Anders***/***Santiago*** brief.

by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

## Section 2511(a)(2)

We first address the involuntary termination of Mother's parental rights under Section 2511(a)(2) because it is dispositive.  ***See id.***  Section 2511(a)(2) provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.  The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

***In re C.M.K.***, 203 A.3d 258, 262 (Pa. Super. 2019) (citations and quotation marks omitted).

Further, this Court has explained:

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are "not limited to affirmative misconduct." ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002).

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (internal citations and quotation marks omitted).

> Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." [*A.L.D.*, 797 A.2d at 340]. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.*

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (some citations omitted and formatting altered).

Here, the trial court noted that although Mother was given an additional six months to remedy the issues that led to Child's removal after CCCYS initially filed a termination petition in May of 2022, Mother failed to demonstrate that she had "taken the necessary steps to be able to provide [Child] with a safe, permanent, and stable home." N.T. Hr'g, 2/8/23, at 44.

In its Rule 1925(a) opinion, the trial court explained:

> At the time of the January 24, 2023 and February 8, 2023 termination of parental rights hearing, [Child] was sixteen months

- 10 -

old and had been out of parental care for almost fifteen of those sixteen months.

At the time of the filing of the second involuntary termination petition, [filed on December 6, 2022,] Mother was again incarcerated and had not completed any of the following court ordered goals, as follows:

a. Cooperate with Cumberland County Probation: Mother had multiple periods of incarceration as a result of her failure to abide by probationary requirements;

b. Maintain consistent visitation with [Child]: Mother's visitation was extremely inconsistent as she had no visitation from December 21, 2021 to April 5, 2022 and guided weekly visitation through ABC from July 7, 2022 through October 8, 2022 with that weekly visitation being disrupted due to her incarceration on or around October 16, 2022;

c. Obtain and maintain stable and appropriate housing: Mother has never demonstrated an ability to maintain stable and appropriate housing for [Child];

d. Maintain frequent communication with CCCYS and provide any and all updates regarding goals to CCCYS: Mother's communication with CCCYS was never frequent as she had no contact with CCCYS between January 2022-April 2022 and her communication with CCCYS beginning in April 2022 was often disrupted due to her frequent probation violations and periods of incarceration;

e. Complete a parenting evaluation through ABC: Mother completed the parenting evaluation through ABC, but was never able to successfully complete all the recommendations from that evaluation to include TIPS parenting education, supervised visitation, mental health counseling, intensive outpatient counseling and attending AA/NA meetings;

f. Complete a drug and alcohol evaluation and follow all recommendations from the evaluation: Mother completed a drug and alcohol evaluation while at Pyramid but has not successfully completed all the recommendations from that evaluation as a result of her

non-compliance with the rules at her recovery/sober houses revocation from Overdose Intervention Court and resultant incarceration;

g. Participate in random drug screening through Restorative Sanctions: Mother only minimally participated in drug screening through Restorative Sanctions as a result of frequent incarcerations and although she had negative screens between June 2022 — August 2022, she tested positive for methamphetamines on August 9, 2022 and missed a drug screen on October 15, 2022.

The kinship parents are an adoptive resource and have cared for [Child] all but thirty-three days of her life and since she was first placed on October 26, 2021.

\* \* \*

Mother has not shown she has the ability to provide safe and stable care for [Child]. All of [Child's] day to day needs and care have been provided by her kinship care parents, but for one month of her life. During that one month while she was living with her parents, both Mother and Father admitted to using illegal substances while actively trying to care for [Child]. Since [Child's] placement into CCCYS legal and physical custody, Mother has not completed a single permanency plan goal. Bearing in mind the utmost importance for [Child] to have permanency, CCCYS filed the first involuntary termination petition back in May of 2022. Mother appeared and made a compelling argument for additional time to work on her reunification goals as she had finally initiated drug and alcohol treatment and was residing at an inpatient facility. Mother was given yet another opportunity to demonstrate her ability to provide [Child] the safe, stable and permanent home she so deserves. Fast forward an additional six months from the June 2022 hearing scheduled on the first involuntary termination petition, and Mother was nowhere closer to completing any of her reunification goals and/or demonstrating that she can provide [Child] with a safe, stable and permanent home.

[Child] remains in the same safe, stable environment with all her needs being met by the kinship caregivers who are dependable and dedicated to the promotion of her healthy development. She remains in that loving environment where she has lived for all but thirty-three days of her life.

Father and Mother have been unable to remedy the deficiencies resulting in the need for ongoing placement and will not be able to remedy the deficiencies in a reasonable amount of time. [Child] has been in the custody of CCCYS for more than fifteen months with the conditions which led to her removal continuing to exist. The record is replete with other equally clear and convincing evidence of Mother's incapacity to meet [C]hild's needs and promote her welfare. Previous additional time and opportunities provided to Mother to remedy the reasons for placement were not seized upon and proven futile.

Trial Ct. Op. at 7-8; 10-11 (unpaginated) (formatting altered).

Following our review, we find no abuse of discretion or error of law in the trial court's conclusion that CCCYS presented clear and convincing evidence to support termination of Mother's parental rights under Section 2511(a)(2). **See S.P.**, 47 A.3d at 826-27; **see also In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009).

Second, the record supports the trial court's findings of fact and its conclusion that the conditions leading to Child's placement continued to exist. **See T.S.M.**, 71 A.3d at 267; **In re I.J.**, 972 A.2d 5, 11 (Pa. Super. 2009). The trial court credited caseworker Ashley Vilka's testimony that Mother minimally complied with her objectives and ultimately failed to complete them. Specifically, Ms. Vilkas testified that Mother had made only "minimal progress" with addressing her drug and alcohol issues. **See** N.T. Hr'g, 1/24/23, at 35. Although Ms. Vilkas acknowledged that Mother only had one positive drug screen since she started testing in June of 2022, she noted that Mother had only participated in testing during the five-month period before she was revoked from OIC, which did not include the periods of time when Mother was

incarcerated. *Id.* at 58-59. Parent educator Carrie Shanahan stated that although Mother completed four of ten TIPS sessions, Mother ultimately stopped attending those sessions after she was incarcerated for the second time. *Id.* at 13-15. Ms. Vilkas rated Mother's compliance with the parenting goal as "minimal compliance, minimal progress" and stated that Mother's inconsistency with visitation "made it difficult to maintain her progress." *Id.* at 29. Finally, Ms. Vilkas stated that Mother had made "no progress" with procuring appropriate housing. *Id.* at 27.

Under these circumstances, the record supports the trial court's conclusion that Mother's continued incapacity has caused Child to be without essential parental care and that the causes of that incapacity cannot or will not be remedied. *See C.M.K.*, 203 A.3d at 262; *Z.P.*, 994 A.2d at 1117-18. Although we recognize that Mother attempted to complete at least some of her objectives, her efforts were insufficient to preserve her parental rights under Section 2511(a)(2). *See id.* at 1117 (stating that a parent's "efforts may be insufficient to remedy parental incapacity under [Section 2511(a)(2)]"); *see also E.A.P.*, 944 A.2d at 82 (explaining that "the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties," particularly when "disruption of the family has already occurred and there is no reasonable prospect for reuniting it" (formatting altered) (citations omitted)).

Therefore, we discern no abuse of discretion by the trial court in determining that Mother's conduct warrants termination under Section

- 14 -

2511(a)(2).  ***See S.P.***, 47 A.3d at 826-27; ***see also R.N.J.***, 985 A.2d at 276.

Accordingly, we agree with Attorney Hitchings' assessment that a challenge

to the trial court's ruling under Section 2511(a)(2)[5] lacks any basis in the facts

or law and would be frivolous.

### Section 2511(b)

We next review the trial court's conclusion that involuntarily terminating

Mother's parental rights best serves Child's developmental, emotional, and

physical needs and welfare pursuant to Section 2511(b), which states:

> **(b) Other considerations.—**The court in terminating the rights
> of a parent shall give primary consideration to the developmental,
> physical and emotional needs and welfare of the child.  The rights
> of a parent shall not be terminated solely on the basis of
> environmental factors such as inadequate housing, furnishings,
> income, clothing and medical care if found to be beyond the
> control of the parent.  With respect to any petition filed pursuant
> to subsection (a)(1), (6) or (8), the court shall not consider any
> efforts by the parent to remedy the conditions described therein
> which are first initiated subsequent to the giving of notice of the
> filing of the petition.

23 Pa.C.S. § 2511(b).  We have explained:

> While a parent's emotional bond with his or her child is a major
> aspect of the subsection 2511(b) best-interest analysis, it is
> nonetheless only one of many factors to be considered by the
> court when determining what is in the best interest of the child.
>
> [I]n addition to a bond examination, the trial court can equally
> emphasize the safety needs of the child, and should also consider
> the intangibles, such as the love, comfort, security, and stability
> the child might have with the foster parent.  Additionally, ... the

---

[5] We reiterate that we need only agree with the trial court as to one subsection
of Section 2511(a).  ***B.L.W.***, 843 A.2d at 384.

trial court should consider the importance of continuity of relationships . . .

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011)).

Our Supreme Court has stated that "if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which 'is not always an easy task.'" ***T.S.M.***, 71 A.3d at 267. In ***K.T.***, our Supreme Court explained that "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." ***Interest of K.T.***, --- A.3d ---, 2023 WL 4092986 at *18 (Pa. filed June 21, 2023). Indeed, the parent-child bond analysis must include "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." ***Id.***

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***T.S.M.***, 71 A.3d at 268 (citation omitted). More specifically, courts must consider "the child's need for permanency and length of time in foster care[;] whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." ***K.T.***, 2023 WL 4092986 at *18.

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***T.S.M.***, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

Here, the trial court explained that Child is "sit[ting] and wait[ing] for a permanent and safe and stable home and continues to live with her kinship parents, the only parents that she truly has ever known" and that "[t]o deprive her of making that her permanent home and to give her biological parents yet another chance and more time is not in her best interest. . . . it is in [her] best interest for her goal to be changed to adoption[.]" ***See*** N.T. Hr'g, 2/8/23, at 45.

Based on our review of the record, we discern no basis to disturb the trial court's finding that termination of Mother's parental rights would best serve Child's needs and welfare. ***See K.T.***, 2023 WL 4092986 at *13; ***T.S.M.***, 71 A.3d at 267. Ms. Vilkas testified that although Mother had participated in some visits with Child, Child does not share a parental bond with Mother and there would be no negative impact on Child if Mother's rights were terminated. N.T. Hr'g, 1/24/23, at 44-45. Ms. Vilkas also explained that Child is bonded with her foster parents, who have cared for Child since she was only one month old, and that Child was "happy," "well adjusted," and "comfortable" in their care. ***Id.*** at 69-70. Ms. Vilkas testified that she has seen interactions between Child and her foster parents and those interactions have been "very

positive." *Id.* at 44. Likewise, foster care specialist Christine Harris stated: "[Child is] very bonded to the resource family, and she interacts appropriately with them. They are very loving and nurturing towards her. It's a typical parent/child relationship." *Id.* at 72. For these reasons, we agree with the assessment of Mother's counsel that a challenge to the trial court's ruling pursuant to Section 2511(b) was frivolous.

In sum, we conclude that Mother's counsel properly determined that the appeals from the trial court's orders terminating Mother's parental rights to the children were frivolous. Further, our independent review reveals no additional, non-frivolous issues in these appeals. *See J.D.H.*, 171 A.3d at 908. Therefore, we grant Attorney Hitchings' petition to withdraw and affirm the order terminating Mother's parental rights.

Order affirmed. Petition to withdraw granted. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/15/2023